**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RACHEL B.,[1] | : | Case No. 2:25-cv-00924 |
| | : | |
| Plaintiff, | : | District Judge James L. Graham |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION[2]

Plaintiff filed applications for Disability Insurance Benefits and Supplemental

Security Income in January 2022. Plaintiff's claims were denied initially and upon

reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge

(ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a

"disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's

request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award

of benefits or, in the alternative, for further proceedings. The Commissioner asks the

Court to affirm the non-disability decision. For the reasons set forth below, the

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

undersigned Magistrate Judge **RECOMMENDS** that the District Judge **REVERSE** the Commissioner's decision and **REMAND** for further proceedings.

## I. BACKGROUND

Plaintiff asserts that she has been under a disability since February 2, 2019. At that time, she was thirty-six years old and was considered a "younger person" under the Social Security regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c).[3] Plaintiff has a "high school education and above." 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No.  7) is summarized in the ALJ's decision ("Decision," Doc. No. 7-4 at PageID 874-907), Plaintiff's Statement of Errors ("SE," Doc. No. 10), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 12), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 13). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II. STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

---

[3] The remaining citations will identify only the pertinent Disability Insurance Benefits Regulations, as they are similar in all relevant respects to the corresponding Supplemental Security Income Regulations.

impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v.*

3

*Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.   FACTS

### A.     The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's applications for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1:     Plaintiff has not engaged in substantial gainful activity since February 2, 2019, the alleged onset date.

Step 2:     She has the severe impairments of levoscoliosis of the lumbar spine, mild to moderate foraminal stenosis of the lumbar spine, degenerative disc disease, osteoarthritis of the sacroiliac joints, lumbar and sacroiliac radiculopathy with neurogenic changes,

4

osteoporosis, depression, anxiety, borderline personality disorder, autism spectrum disorder, and attention deficit hyperactivity disorder.

She has the nonsevere impairments of celiac disease, irritable bowel syndrome, gastroesophageal reflux disease, migraine headaches, and bilateral occipital neuralgia.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "[S]he could occasionally climb ramps and stairs. She could never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, and crawl. She should avoid unprotected heights, operation of hazardous machinery, and commercial driving. She would need to use a handheld assistive device such as a cane for prolonged ambulation but could carry light objects in contra with her bilateral upper extremities. She would require a sit and stand option that allows her to sit up to 1 hour at a time before needing to stand for up to 30 minutes at one time before needing to sit down. She could concentrate, persist, and remain on pace while doing detailed but not complex tasks."

She has no past relevant work.

Step 5:     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

(Decision, Doc. No. 7-4 at PageID 880-902.) These findings led the ALJ to conclude that

Plaintiff does not meet the definition of disability. (*Id.* at PageID 902.)

5

**B.      Migraine Headaches**

**1.      Disability reports and hearing testimony**

Plaintiff alleged that she is disabled by several physical and mental impairments, including migraine headaches. (AR, Doc. No. 7-7 at PageID 1054.) In a February 2022 Function Report, Plaintiff reported that she experienced migraines that lasted "days at a time" and was sometimes unable to leave home due to migraines. (*Id.* at PageID 1068-71.) Plaintiff testified during the March 2024 hearing that her migraine headaches sometimes lasted one to two days. (AR, Doc. No. 7-3 at PageID 820.)  She stated that she had "one to two really bad [migraines] a month," but the frequency was "down from one to two a week." (*Id.*) Plaintiff saw a neurologist once every four months for her migraines and received lidocaine and steroid nerve block injections. (*Id.* at PageID 820-21.) She said she began taking Zyrtec as a "short-term migraine solution." (*Id.* at PageID 821.)

**2.      Medical records**

Approximately six months before the February 2019 alleged disability onset date, Plaintiff told her primary care physician that she was experiencing migraine headaches, although they were "less frequent" after her neurologist administered an occipital nerve block injection. (AR, Doc. No. 7-9 at PageID 1683.) During osteopathic manipulation therapy visits for back pain complaints that occurred between November 2018 and February 2019, Plaintiff also complained of symptoms that included headaches. (*Id.* at PageID 1607, 1613, 1620, 1630, 1641.)

Plaintiff saw her neurologist shortly after the alleged disability onset date, in March 2019. (AR, Doc. No. 7-9 at PageID 1604-06.) Plaintiff reported "infrequent

6

episodic migraines" that occurred one to two times in the past six months. (*Id.* at PageID 1604-05.) However, she was currently experiencing a severe migraine that started seven days earlier and caused fatigue and dizziness. (*Id.*) Kathleen Moore, A.P.R.N.-C.N.P. reported that Plaintiff exhibited marked bilateral occipital neuralgia upon examination. (*Id.* at PageID 1604-06.) Nurse Moore administered an occipital nerve injection. (*Id.* at PageID 1606.) Later that month, neurologist Kevin Weber, M.D. reported that an examination again showed marked bilateral occipital nerve tenderness and chronic pain, and he administered another occipital nerve injection. (*Id.* at PageID 1596.)

In April 2019, Plaintiff told Dr. Weber that she was experiencing another migraine and was unable to attend an appointment at the infusion center. (AR, Doc. No. 7-9 at PageID 1593.) At a follow-up neurology visit in July 2019, Plaintiff said that was using cannabidiol (CBD) oil for rescue treatment, which "work[ed] well." (*Id.* at PageID 1559.) Nevertheless, Plaintiff said she was having approximately one migraine per month. (*Id.* at PageID 1558-59.) Plaintiff also reported that she was currently experiencing a migraine, and a physical examination showed severe bilateral occipital neuralgia. (*Id.*) Alexa McGuire, A.P.R.N.-C.N.P. administered another occipital nerve injection. (*Id.* at PageID 1560.) Plaintiff continued to complain of headache symptoms during several osteopathic manipulation therapy visits between May and November 2019. (AR, Doc. No. 7-9 at PageID 1531, 1545, 1550, 1554, 1561, 1587.)

Neurologist Dr. Weber administered another occipital nerve block and trigger point injections in January 2020. (AR, Doc. No. 7-9 at PageID 1511, 1520-21.) Although Dr. Weber noted that the injections "provide months of relief," he prescribed Relpax "for

rescue as multiple other triptans have been ineffective or with side effects." (*Id.* at PageID 1521.) Dr. Weber also reported that the physical examination showed marked bilateral occipital nerve tenderness and cervicalgia pain. (*Id.* at PageID 1520.)

At a follow-up visit in February 2020, Plaintiff stated that the trigger point injections helped "a bit." (AR, Doc. No. 7-9 at PageID 1511.) She reported "fewer knots in her neck" but otherwise stated that her neck had been "very tight" and she was experiencing "a lot of occipital pain." (*Id.*) Plaintiff also reported twenty-five headache days in the past month. (*Id.*) The provider documented marked bilateral occipital nerve tenderness and chronic pain upon a physical examination, and she administered another occipital nerve injection. (*Id.* at PageID 1511-12.)

Plaintiff saw Christina McGhee, A.P.R.N.-C.N.P. for her neck pain complaints later that month, and said that medications and occipital nerve blocks provided only "some relief" from her migraines. (AR, Doc. No. 7-9 at PageID 1591-92.) A physical examination showed moderate tenderness to palpation at the base of the right side of the neck. (*Id.* at PageID 1495.)

At a March 2020 neurology visit, Plaintiff said that her migraines had changed in nature from "a dull ache at [the] back of [the] head" to "more of a pulsing in her right temple." (AR, Doc. No. 7-9 at PageID 1478.) Although Plaintiff reported that Niacin and Triptan had been "helping knock out these headaches," she was experiencing "a lot more nausea, which lingers." (*Id.*) Nevertheless, Plaintiff reported eighteen headache days and twelve migraine days per month, including two during the past week. (*Id.*) Plaintiff's provider continued her preventive and acute medications but also prescribed Ondansetron

for nausea. (*Id.* at PageID 1477.) Nurse Moore administered an occipital nerve injection in May 2020. (*Id.* at PageID 1476.)

When Plaintiff presented for a follow-up neurology appointment in June 2020, she reported "90% relief" from the May 2020 injection. (AR, Doc. No. 7-9 at PageID 1470.) Plaintiff said her migraine headaches had "dissipated" since the injection and reported zero migraine days and five headache days during the last month. (*Id.*) In October 2020, Plaintiff told a provider that Duloxetine "help[ed] with migraines and to sleep." (*Id.* at PageID 1391.) Plaintiff denied headaches during an osteopathic manipulation therapy session in March 2021. (*Id.* at PageID 1326.) An EMG and nerve conduction study in March 2021 was unremarkable. (AR, Doc. No. 7-11 at PageID 2285.)

Plaintiff sought emergency room treatment for a migraine in May 2021. (AR, Doc. No. 7-8 at PageID 1160.) She said the migraine had persisted for four days and her CBD oils had not been working. (*Id.*) A physical examination was normal. The attending physician administered a "migraine cocktail" of magnesium, Decadron, Zofran, and Benadryl. (*Id.* at PageID 1164-65.) Plaintiff was released without being admitted for further treatment, with instructions to follow up with her neurologist. (*Id.*) During Plaintiff's follow-up visit with her neurologist later that month, Dr. Weber documented marked bilateral occipital nerve tenderness and chronic pain. He administered another occipital nerve injection. (AR, Doc. No. 7-9 at PageID 1797-98.) At the next visit with Dr. Weber in January 2022, Plaintiff reported "occasional" migraines and said that she experienced two migraine days per month "until the block wears off and she has more frequent migraine[s]." (*Id.* at PageID 1212-13.)

9

During primary care visits in August 2022 and August 2023, Plaintiff denied any specific headache complaints. (AR, Doc. No. 7-15 at PageID 3126, 3260-61.) But during a physical therapy session in January 2024, Plaintiff said she had been experiencing a migraine headache for the past two to three days. (*Id.* at PageID 3455.) Plaintiff saw neurologist Dr. Weber the next day. (*Id.* at PageID 3451.) Dr. Weber documented marked bilateral occipital nerve tenderness and chronic pain, and he administered an occipital nerve injection. (*Id.* at PageID 3451-52.) Dr. Weber noted that the injections were currently providing "up to [two] years of 100% pain relief," as Plaintiff last received an injection in January 2022. (*Id.* at PageID 3451.)

### 3. The ALJ's decision

At Step Two, the ALJ concluded that migraine headaches are not a "severe" impairment as defined in 20 C.F.R. § 404.1520(c). (Decision, Doc. No. 7-4 at PageID 881-82.) The ALJ summarized some of Plaintiff's subjective complaints and the treatment that she received for migraine headaches and bilateral occipital neuralgia. (*Id.*) The ALJ cited a July 2016 neurological progress note and noted that Plaintiff reported "that she usually only has one migraine headache per month." (*Id.* at PageID 881.) The ALJ also stated: "Examination testing showed unremarkable findings with intact sensations and a stable gait." (*Id.*) Next, the ALJ cited progress notes from Plaintiff's March 2021 visit to the Ohio State Neurology Clinic for an evaluation of her neuropathy symptom. (*Id.*) The ALJ acknowledged that Plaintiff complained of headaches, but emphasized that EMG testing at that time showed normal findings and many physical examinations showed unremarkable findings. (*Id.*)

10

The ALJ acknowledged that Plaintiff sought emergency room treatment for a migraine headache in May 2021 but reasoned that neurological testing showed no focal deficits. (Decision, Doc. No. 7-4 at PageID 881.) The ALJ also noted Plaintiff's report that her migraines were "well controlled" after receiving a "migraine cocktail" and intravenous fluids. (*Id.*) Next, citing a neurology progress note from January 2022, the ALJ acknowledged that Plaintiff reported "occasional migraine headaches twice per month" and that Dr. Weaver documented bilateral occipital nerve tenderness and pain upon a physical examination. (*Id.* at PageID 882.) The ALJ further noted: "However, treatment notes documented that the claimant received occipital nerve injection treatment on May 1, 2020, May 6, 2021, and January 5, 2022." (*Id.*) The ALJ concluded:

> [D]uring an office visit on January 3, 2024, treatment notes documented that the claimant received a bilateral occipital neuralgia injection in January 2022 that has provided her 100% relief from her symptoms for the past 2 years. (Ex.8F/8) Accordingly, I find that these impairments do not have more than de minimis effect on the claimant's ability to perform substantial gainful activity on a sustained basis and are "non-severe."

(*Id.*)

The ALJ did not specifically discuss Plaintiff's migraine headaches in the RFC analysis. (*See* Decision, Doc. No. 7-4 at PageID 887-900.) However, in her summary of the applicable legal standard for evaluating Plaintiff's subjective complaints, the ALJ stated: "I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (*Id.* at PageID 888.) The ALJ also noted that she was required to "consider all of

[Plaintiff's] impairments, including impairments that are not severe" when formulating the RFC. (*Id.* at PageID 879 (citing 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling (SSR) 96-8p).)

## IV.    LAW AND ANALYSIS

Plaintiff asserts just one error: "The ALJ erred by erroneously classifying [Plaintiff's] migraine headaches as a not severe impairment." (SE, Doc. No. 10 at PageID 3697.) For the reasons discussed below, the undersigned concludes this asserted error is well-taken and therefore recommends that the ALJ's decision be reversed and remanded.

### A.    Applicable Legal Framework

An ALJ evaluates the severity of a claimant's impairments at Step Two of the sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(ii). Plaintiff bears the burden of establishing that she has a severe impairment that meets the twelve-month duration requirement. *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012); 20 C.F.R. §§ 404.1509 & 404.1520(a)(4)(ii). However, the burden of establishing that an impairment is severe is a "de minimis hurdle in the disability determination process," *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), and is intended only to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). An impairment is severe if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work ...." Social Security Ruling (SSR) 85-28, 1985 WL

56856, at *3 (S.S.A. January 1, 1985).[4] *Accord Higgs*, 880 F.2d at 862 ("[A]n impairment can be considered not severe ***only if it is a slight abnormality that minimally affects work ability*** regardless of age, education, and experience.") (emphasis added).

Social Security Ruling (SSR) 19-4p governs an ALJ's consideration of headache disorders. SSR 19-4p, 2019 WL 4169635 (S.S.A. Aug. 26, 2019). SSR 19-4p provides guidance on how "primary headache disorders" – including migraine headaches – are established and evaluated. *Id.* at *4. It notes that physicians diagnose a primary headache disorder "only after excluding alternative medical and psychiatric causes of a person's symptoms," and "after reviewing a person's full medical and headache history and conducting a physical and neurological examination." (*Id.* at *4.) To rule out other medical conditions, a physician "may also conduct laboratory tests or imaging scans." (*Id.*) But while such imaging "may be useful ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder diagnosis." (*Id.*) For example: "[P]hysicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis." (*Id.*)

The SSR also lists the types of objective evidence that an ALJ will consider when determining whether headaches constitute a medically determinable impairment (MDI) at Step 2. *Id.* at *5-6. The ALJ "will not establish the existence of an MDI based only on a

---

[4] Although SSRs do not have the same force and effect as statutes or regulations, they "are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)).

diagnosis or a statement of symptoms" but "will consider the following combination of

findings reported by an [acceptable medical source (AMS)]":

- A primary headache disorder diagnosis from an AMS. Other disorders have similar symptoms, signs, and laboratory findings. A diagnosis of one of the primary headache disorders by an AMS identifies the specific condition that is causing the person's symptoms. The evidence must document that the AMS who made the diagnosis reviewed the person's medical history, conducted a physical examination, and made the diagnosis of primary headache disorder only after excluding alternative medical and psychiatric causes of the person's symptoms. In addition, the treatment notes must be consistent with the diagnosis of a primary headache disorder.

- An observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an AMS. During a physical examination, an AMS is often able to observe and document signs that co-occur prior to, during, and following the headache event. Examples of co-occurring observable signs include occasional tremors, problems concentrating or remembering, neck stiffness, dizziness, gait instability, skin flushing, nasal congestion or rhinorrhea (runny nose), puffy eyelid, forehead or facial sweating, pallor, constriction of the pupil, drooping of the upper eyelid, red eye, secretion of tears, and the need to be in a quiet or dark room during the examination. In the absence of direct observation of a typical headache event by an AMS, we may consider a third party observation of a typical headache event, and any co-occurring observable signs, when the third party's description of the event is documented by an AMS and consistent with the evidence in the case file.

- Remarkable or unremarkable findings on laboratory tests. We will make every reasonable effort to obtain the results of laboratory tests. We will not routinely purchase tests related to a person's headaches or allegations of headaches. We will not purchase imaging or other diagnostic or laboratory tests that are complex, may involve significant risk, or are invasive.

- Response to treatment. Medications and other medical interventions are generally tailored to a person's unique symptoms, predicted response, and risk of side effects. Examples of medications used to treat primary headache disorders include, but are not limited to, botulinum neurotoxin (Botox®), anticonvulsants, and antidepressants. We will consider whether the person's headache symptoms have improved, worsened, or remained stable despite treatment and consider medical opinions related to the person's physical strength and functional abilities. When evidence in the

14

> file from an AMS documents ongoing headaches that persist despite treatment, such findings may constitute medical signs that help to establish the presence of an MDI.

*Id.* at *6.

SSR 19-4p also directs the ALJ how to consider headaches when assessing the RFC:

> We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC. The RFC is the most a person can do despite his or her limitation(s). We consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record. For example, symptoms of a primary headache disorder, such as photophobia, may cause a person to have difficulty sustaining attention and concentration. Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC.

*Id.* at *7-8.

**B.      The ALJ's Conclusion That Plaintiff's Migraines Are Nonsevere Is Not Supported By Substantial Evidence.**

Because significant evidence supports Plaintiff's claim that migraine headaches affect her ability to work, the undersigned finds that the ALJ's conclusion that Plaintiff's migraines are nonsevere is not supported by substantial evidence.

Plaintiff testified during the March 2024 hearing that she experienced one to two migraines per month, and that the headaches sometimes lasted for one to two days. (AR, Doc. No. 7-3 at PageID 820.) She stated in a function report that she was sometimes unable to leave home due to migraines. (AR, Doc. No. 7-7 at PageID 1071.)

To some extent, Plaintiff's complaints are corroborated by the medical records. In March 2019, Plaintiff reported "infrequent" migraines that had occurred one to two times

15

in the past six months. (AR, Doc. No. 7-9 at PageID 1604-05.) However, she also said that her current migraine started seven days earlier and also caused fatigue and dizziness. (*Id.*) A physical examination showed marked bilateral occipital neuralgia, and her neurology nurse administered an occipital nerve injection. (*Id.* at PageID 1606.)

More than a year later, Plaintiff's migraines had increased in frequency. She required another injection in March 2019 and reported another migraine in April 2019. (AR, Doc. No. 7-9 at PageID 1593, 1596.) She received additional injections in July 2019, January 2020, February 2020, and May 2020. (*Id.* at PageID 1476, 1511-12, 1520-21, 1560.) Plaintiff told her neurologist in July 2019 that she had been having a migraine once per month, despite using CBD oil for rescue treatment. (*Id.* at PageID 1558.) And contrary to the ALJ's statement that the July 2019 examination was "unremarkable," Nurse McGuire documented marked bilateral suboccipital nerve tenderness, as well as paracervical and upper shoulder tenderness and hypertonicity. (*Compare* Decision, Doc. No. 7-4 at PageID 881, *with* AR, Doc. No. 7-9 at PageID 1560.)

Dr. Weber noted in January 2020 that the injections provided "months of relief" but prescribed Relpax as a rescue medication because "multiple other triptans" had been ineffective or caused side effects. (*Id.* at PageID 1521.) The following month, Plaintiff reported having twenty-five headache days and said that no triptans had provided relief. (*Id.* at PageID 1511.) Although Plaintiff stated in March 2020 that her medications had been helping to "knock out" her headaches, she reported eighteen headache days and twelve migraine days in the past month, including two headaches in the past week. (*Id.* at PageID 1478.) She also complained of increased nausea, which "linger[ed]." (*Id.*) Several

16

physical examinations performed through May 2020 showed severe bilateral occipital neuralgia and pain. (AR, Doc. No. 7-9 at PageID 1476, 1511-12, 1520, 1558-59, 1596.)

After the May 2020 injection, there appears to have been a period of improvement. Plaintiff told her neurologist in June 2020 that her headaches had "dissipated" since the injection, and she reported only five headaches and no migraines during the past month. (AR, Doc. No. 7-9 at PageID 1470.) As the ALJ noted, an EMG and nerve conduction study in March 2021 was unremarkable. (AR, Doc. No. 7-11 at PageID 2285; *see also* Decision, Doc. No. 7-4 at PageID 881.)

However, Plaintiff sought emergency room treatment for a migraine in May 2021. (AR, Doc. No. 7-8 at PageID 1160.) She said that the migraine had persisted for four days and that CBD oils had not been working. (*Id.*) Plaintiff saw her neurologist later that month and received another occipital nerve injection. (AR, Doc. No. 7-9 at PageID 1797-98.) At a follow-up visit with Dr. Weber in January 2022, Plaintiff reported two migraine days per month since the May 2021 injection. (*Id.* at PageID 1212-13.) She said that she experienced "more frequent migraine[s]" after the block wore off. (*Id.*) Plaintiff also said that Eletriptan was no longer effective for rescue treatment. (*Id.* at PageID 1213.) Dr. Weber administered another occipital nerve injection at that visit. (*Id.* at PageID 1213.)

The medical records showed a longer period of improvement after the January 2022 injection. Plaintiff denied headaches during primary care visits in August 2022 and August 2023 (AR, Doc. No. 7-15 at PageID 2126, 3260-61). She did not require another injection until January 2024, and Dr. Weber stated that the prior injection had provided "up to [two] years of 100% pain relief." (*Id.* at PageID 3451-52.)

17

The ALJ did not acknowledge or address most of this evidence, including most of the evidence dated prior to March 2021, when she reasoned that Plaintiff's treatment provided relief of her symptoms and concluded that Plaintiff's migraines did not cause more than a minimal effect on Plaintiff's ability to perform basic work activities. (Decision, Doc. No. 7-4 at PageID 881-82.) Therefore, the undersigned finds that the ALJ's conclusion is not supported by substantial evidence.

Defendant argues that "Plaintiff's mostly unremarkable examinations and relief of symptoms provide substantial evidence for the ALJ's finding that Plaintiff's headaches were non-severe." (Mem. In Opp., Doc. No. 12 at PageID 3708.) This argument ignores the fact that many progress notes, including the neurological progress notes that were dated between March 2019 and May 2020, showed severe bilateral occipital neuralgia and pain. (AR, Doc. No. 7-9 at PageID1476, 1511-12, 1520, 1558-59, 1596, 1606.) The ALJ also ignored these physical examination abnormalities when she discussed Plaintiff's migraines, instead citing several normal physical examinations. (Decision, Doc. No. 7-4 at PageID 881-82.)

Moreover, Defendant's argument fails to acknowledge that the medical records show significant periods of time (lasting for more than twelve months) where Plaintiff's treatment did *not* provide "relief" of her migraine symptoms.[5] The ALJ, too, ignored the medical records that were dated through May 2020 and showed that Plaintiff required

---

[5] To meet the duration requirement for a severe impairment, an impairment need only "have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509; *Harley*, 485 F. App'x at 803.

approximately five occipital nerve injections and yet continued to complain of at least one to two migraines per month, as well as numerous breakthrough headaches. (*Id.* at PageID 1476-78, 1511-12, 1520-21, 1558-60, 1593, 1596, 1606.) Instead, the ALJ focused on Plaintiff's July 2019 report that she was experiencing one migraine per month, and her January 2022 statement that she had approximately two migraines per month. (Decision, Doc. No. 7-4 at PageID 881-82.)

The undersigned acknowledges that an ALJ's decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Nevertheless, the ALJ's "factual findings as a whole" must show that she "implicitly resolved the conflicts in the evidence." *Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). The ALJ must also "provide sufficient explanation for the claimant and any reviewing court to 'trace the path of his reasoning'" and explain "with specificity" how the evidence supports the RFC limitations. *Correa*, 2023 U.S. Dist. LEXIS 231766, at *31-32 (citing *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011); *Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 U.S. App. LEXIS 1621, at *12 (6th Cir. Feb, 2, 1999); *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 U.S. Dist. LEXIS 11925, at *12 (S.D. Ohio Feb. 8, 2011)).

19

Here, the ALJ's failure to acknowledge significant evidence that supports the claimed severity and frequency of Plaintiff's migraines leads the undersigned to conclude that the ALJ did not resolve conflicts in the evidence, especially when considering the *de minimis* standard that applies at Step Two. *Higgs*, 880 F.2d at 862. Further, the ALJ's apparent failure to consider evidence that contradicts her conclusions signifies an impermissibly selective review of the record. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record"); *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports")). Thus, the undersigned finds that the ALJ's conclusion that Plaintiff's migraines are nonsevere is unsupported by substantial evidence.

## C.  Because The ALJ's Error Is Not Harmless, Reversal Is Warranted.

Defendant argues that the Court should nevertheless affirm the ALJ's decision because the ALJ's failure to find Plaintiff's migraines severe at Step Two is "'legally irrelevant.'" (Mem. In Opp., Doc. No. 12 at PageID 3710-11 (citing *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020)).) Defendant contends that "the ALJ's RFC finding fully accounted for Plaintiff's symptoms." (*Id.* at PageID 3710.) According to Defendant: "[T]he ALJ stated that her RFC finding reflected the limitations from all of Plaintiff's impairments, including those that were non-severe," and so "although the ALJ did not find Plaintiff's migraines to be severe, she still considered their effects when assessing Plaintiff's RFC, and substantial evidence supports her conclusions." (*Id.* at PageID 3711.) Defendant also asserts that the state agency medical consultants accounted

20

for Plaintiff's headaches in their assessment. (*Id.*) According to Defendant, because the ALJ adopted the consultants' limitations the RFC, the consultants' findings constitute substantial evidence to support the ALJ's RFC finding. (*Id.* at PageID 3711-12.)

These assertions are not well-taken. When formulating a claimant's RFC, the ALJ must consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). If an ALJ finds at least one severe impairment, then the failure to find additional severe impairments at Step Two "[does] not constitute reversible error" if the ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination." *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (citing *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir.1987)). In other words, if the ALJ "finds at least one severe impairment and analyzes all impairments in the following steps, the characterization of other impairments as severe or nonsevere is 'legally irrelevant.'" *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 817 (6th Cir. 2020) (quoting *Anthony*, 266 F. App'x at 457 (6th Cir. 2008)).

These rules presuppose that the ALJ considered all nonsevere impairments when assessing the RFC. It is possible for the Court to find that the ALJ did not, in fact, do so. In *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015), for example, the court held that because the RFC determination "did not consider [plaintiff's] mental impairments in a meaningful way," the ALJ's error in categorizing those impairments as nonsevere was not harmless and required reversal. *Winn*, 615 F. App'x at 326.

21

This case is analogous to *Winn.* As an initial matter, the undersigned cannot determine whether the ALJ included limitations in the RFC to account for Plaintiff's migraines. More importantly, as discussed above, the ALJ's failure to acknowledge and account for evidence that showed Plaintiff's migraines did not successfully respond to treatment for at least a twelve-month period shows that the ALJ "did not consider" those migraines "in a meaningful way." *Winn*, 615 F. App'x at 326.

The ALJ's partial reliance on the state agency medical consultants' assessments does not cure this error. The consultants opined that Plaintiff had several severe physical impairments, including migraines. (AR, Doc. No. 7-4 at PageID 838, 857.) They opined that Plaintiff could perform the exertion requirements consistent with light work (lift and/or carry up to twenty pounds occasionally and ten pounds frequently, stand and/or walk for a total of approximately six hours in an eight-hour workday, and sit for approximately six hours in an eight-hour workday), with the following non-exertional limitations: never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, stoop, crouch, and crawl; and avoid all exposure to hazards, such as heavy machinery, unprotected heights, and moving mechanical parts. (*Id.* at PageID 840-41, 860-61.) The ALJ concluded that the consultants' findings were "persuasive to the extent they support a reduced range of light work with postural and environmental limitations." (Decision, Doc. No. 7-4 at PageID 897.) The ALJ incorporated the consultants' assessed limitations

into the RFC and explained that she included additional limitations "due to the severity of [Plaintiff's] impairments.[6] (*Id.*)

However, although the consultants included migraines in their list of Plaintiff's severe impairments (AR, Doc. No. 7-4 at PageID 838, 858), they did not identify any functional restrictions to account for Plaintiff's migraines. (*Id.* at PageID 840-41, 860-61.) Moreover, they attributed their identified exertional limitations, postural limitations, and environmental restrictions only to Plaintiff's history of osteoarthritis, back pain and spine condition, and use of a spinal cord stimulator—not to her migraine headaches. (*Id.* at PageID 840-41, 860-61.) Therefore, the fact that the ALJ incorporated the consultants' limitations into the RFC does not constitute substantial evidence to demonstrate that she accounted for Plaintiff's migraines in the RFC.

Finally, Defendant relies on a case from this Court to argue that the limitations identified by the consultants—and adopted by the ALJ in the RFC—reasonably accounted for Plaintiff's migraines "by reducing strain in Plaintiff's upper body and head." (Mem. In Opp., Doc. No. 12 at PageID 3711 (citing *Brittany S. v. Comm'r of Soc. Sec.*, No. 2:25-cv-00311, 2026 WL 456732, at *14 (S.D. Ohio Feb. 18, 2026) (Gentry, M.J.), *report and recommendation adopted*, No. 2:25-cv-311, 2026 WL 716378 (S.D. Ohio Mar. 13, 2026) (Sargus, D.J.)).) But *Brittany S.* does not aid the Defendant here.

In *Brittany S.*, as in this case, ALJ found that the plaintiff's migraine headaches were nonsevere and the Court concluded that the ALJ's conclusion was not supported by

---

[6] In her supporting explanation for the additional limitations, the ALJ cited evidence related to Plaintiff's severe impairments but made no mention of migraines. (*Id.* at PageID 897-98.)

23

substantial evidence. 2026 WL 456732, at *12-14. Unlike this case, however, the state agency medical consultants in *Brittany S.* identified certain limitations to account for the migraines. 2026 WL 716378, at *15. The ALJ rejected those limitations, in part, because they were "inconsistent with evidence showing [the plaintiff's] migraines are controlled with medications." This Court acknowledged that the consultants' proposed limitations "could have accounted for—at least to some extent—[the plaintiff's] migraines." 2026 WL 456732, at *14. The Court concluded that the ALJ's explicit rejection of those limitations provided additional evidence of the ALJ's failure to consider the plaintiff's migraines "in a meaningful way." *Id.* (citing *Winn*, 615 F. App'x at 325-26).

These facts are not analogous to this case. Moreover, to the extent that *Brittany S.* is instructive, it favors Plaintiff. Just like *Brittany S.*, the ALJ here failed to acknowledge significant evidence that supports the claimed severity and frequency of Plaintiff's migraines. *See* 2026 WL 456732, at *14. This ALJ's failure to include limitations in the RFC to account for Plaintiff's migraines, combined with the fact that she ignored significant evidence related to Plaintiff's migraines, shows that the ALJ did not consider Plaintiff's migraines "in a meaningful way." *See Winn*, 615 F. App'x at 325-26.

In sum, because the RFC determination did not consider Plaintiff's migraines "in a meaningful way," the ALJ's error is not harmless. The undersigned therefore recommends that the District Judge reverse and remand the ALJ's decision.

## V.    REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for

24

rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. However, the undersigned recommends that the District Judge enter an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g). On remand, the ALJ should further develop the record as necessary, particularly as to Plaintiff's migraine headaches, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.    Plaintiff's Statement of Errors (Doc. No. 10) be GRANTED;

2.    The Court REVERSE the Commissioner's non-disability determination;

3.    No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.    This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.    This case be terminated on the Court's docket.

_s/ Caroline H. Gentry_
Caroline H. Gentry
United States Magistrate Judge


**DEADLINE TO FILE OBJECTIONS**

In accordance with Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may file and serve specific written objections to this Report and Recommendation ("R&R") **within fourteen (14) days** after being served with a copy. A party may respond to another party's objections **within fourteen (14) days** after being served with a copy. If necessary, the objecting party must promptly arrange for transcribing the record, or whatever portions of it to which the parties agree or the Magistrate Judge considers sufficient. If proper objections are timely filed, then the District Judge will conduct a de novo review of the challenged portion(s) of the R&R. Failure to file timely objections may forfeit rights on appeal. _See U.S. v. Walters_, 638 F.2d 947, 949-50 (6th Cir. 1981).